PITTMAN, Judge.
The Finish Line, doing business as Clay, Metal and Stone (“Finish Line”), appeals from summary judgments in favor of J.F. Pate & Associates Contractors, Inc. (“Pate”), and Western Surety Company (“Western”) on its “little Miller Act” claims against them. See Ala.Code 1975, § 39-1-1 et seq. We affirm.

Facts and Procedural History

The Baldwin County Board of Education (“the Board”) employed Pate as the general contractor for the construction of Foley Middle School. Pate entered into a subcontract with Delta Flooring, Inc. (“Delta”), to provide labor, materials, and equipment for the installation of tile, resilient flooring, and carpet in the school. Amendment (A) to the subcontract contained the following provision:
“Note: This is a tax exempt project. All material purchases will be made by special purchase order forms obtained by [Pate’s] office. Invoices for these materials should be made out to Baldwin County Board of Education c/o (your company’s name) — and the original copies should be submitted with your application for payment.”
On May 9, 2007, Pate, in its capacity as purchasing agent for the Board, signed a purchase order for 5,000 square feet of Seneca tile at a cost of $39,075. The purchase-order form designated Finish Line as the vendor, Delta as the party to whom the tile should be shipped, and the “Board c/o Delta” as the entity to whom the invoice for payment should be sent. Finish Line filled the order and shipped the tile to Delta in June 2007. It is undisputed that Finish Line received payment in the amount of $39,075 for the tile from Pate. Delta stored the tile in its warehouse until April 2008, when Pate instructed Delta to install the tile in the canteen area of the school gymnasium. On May 8, 2008, before Delta finished the installation, Jim Walker of Goodwyn, Mills and Cawood, the project architect, and John Pate, the chief operating officer of Pate, met with representatives of Finish Line and Delta to inspect the tile that had been installed. The architect found the tile “unacceptable due to the irregularities and inconsistencies in ... shape, surface and appearance.” Finish Line requested and was given an opportunity to cure the problem. On May 22, 2008, the architect, having concluded that Finish Line’s proposed solution would not cure the problem, sent Pate a memorandum formally rejecting the tiles, directing their removal, and ordering the installation of an alternate tile product. It is undisputed that Pate ordered and paid for the alternate tiles. Meanwhile, on April 30, 2008, Pate, in its capacity as purchasing agent for the Board, had signed another purchase order for additional flooring materials to be installed in other areas of the school. The party designations on that purchase order were the same as those on the first purchase order; Finish Line was named as the vendor, Delta as the party to whom the materials should be shipped, and the “Board c/o Delta” as the entity to whom the invoice for payment should be sent. Delta installed the flooring materials in the school, and Finish Line sent Delta an invoice in the amount of $34,123.12. Pate refused payment on that invoice, asserting that it was entitled to a setoff for the $39,075 payment it had made earlier for the Seneca tiles that had been rejected by the architect.
On February 19, 2009, Finish Line sued Pate, Pate’s surety (Western), Delta, and two individuals who had signed personal guaranties for the credit Finish Line had extended to Delta. The complaint assert *751 ed one claim: that “the defendants” had failed and refused to pay for flooring materials that Finish Line had supplied to the Foley Middle School construction project. Pate answered and asserted, among other defenses, that Finish Line lacked standing to sue Pate because Finish Line was not in privity of contract with Pate; that Finish Line had supplied a defective product that had been rejected by the architect and that had not been incorporated into the school; and that Pate was entitled to set off the amount it had paid for the defective tiles against the amount Finish Line demanded in the complaint. Western asserted the same defenses and contended that it was not liable to Finish Line because, it said, Pate was not liable to Finish Line. Pate also cross-claimed against Delta, alleging breach of contract, breach of warranty, and contractual and common-law indemnity. Specifically, Pate alleged that Delta had provided defective and/or nonconforming materials for the construction project — materials that had been rejected by the project architect.
Delta answered the complaint and moved for a partial summary judgment on the claim asserted by Finish Line, contending that it was not liable to pay Finish Line because, it said, it was not the purchaser of the flooring materials and it was not in privity of contract with Finish Line. Delta asserted that Pate, as the Board’s agent, not Delta, had ordered and was responsible to pay for the materials supplied by Finish Line. Delta also denied that its installation of the Seneca tiles was the reason for the architect’s rejection of the tiles and the Board’s refusal to pay Finish Line’s second invoice.[1] Delta also answered Pate’s cross-claim, generally denying all the allegations therein.
In opposition to Delta’s motion for a partial summary judgment, Finish Line asserted that the problem with the Seneca tiles had been the result of Delta’s faulty installation. In support of that assertion, Finish Line submitted the affidavit of Jim Smith, its credit manager, who stated:
“[T]he tiles supplied to both the Foley Middle School and Fairhope Middle School were manufactured by Seneca Tiles at the same time, in the same plant, and were the same used in both schools.
“We assert that improper installation methods contributed to the rejection of the installation at Foley Middle School. Upon visual examination of the job prior to tear out, it was evident that the grout joints were significantly smaller than the 3/8" joint recommended by the manufacturer. Also, in conversation with the installers we were told that they used 1/4" trowels to set these tiles, half the size of the 1/2" trowel knot size recommended by the manufacturer.
“This same material was installed by an Atlanta based contractor in the Fair-hope Middle School without incident and was accepted by the general contractor and the County Board of Education. The material provided on both school jobs was manufactured at the same time and both jobs shipped from the same production run.
“The architect, Goodwyn, Mills & Ca-wood of Alabama, specified the Seneca Tiles used on both jobs and accepted the material as properly installed on the Fairhope Middle School [project].”
The trial court granted Delta’s motion for a partial summary judgment and certified that judgment as final under Rule 54(b), *752 Ala. R. Civ. P. The trial court subsequently granted summary-judgment motions filed by Pate, Western, and Delta’s guarantors. The trial court did not specify its reasons for granting any of the summary-judgment motions. Finish Line filed a postjudgment motion; after that motion was denied, Finish Line appealed to this court from the trial court’s judgments in favor of Pate and Western.[2]

Standard of Review

Appellate review of a summary judgment is de novo. Ex parte Ballew, 771 So.2d 1040 (Ala.2000). A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3); see Lee v. City of Gadsden, 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’ ” Lee, 592 So.2d at 1038 (footnote omitted). “[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see § 12 — 21—12(d), Ala.Code 1975.

Discussion

I.
This case arises under Ala.Code 1975, § 39-1-1 et seq., commonly known as the “little Miller Act.” Section 39-1-1 provides, in pertinent part:
“(a) Any person entering into a contract with an awarding authority in this state for the prosecution of any public works shall, before commencing the work, execute a performance bond, with penalty equal to 100 percent of the amount of the contract price. In addition, another bond, payable to the awarding authority letting the contract, shall be executed in an amount not less than 50 percent of the contract price, with the obligation that the contractor or contractors shall promptly make payments to all persons supplying labor, materials, or supplies for or in the prosecution of the work provided in the contract and for the payment of reasonable attorneys’ fees incurred by successful claimants or plaintiffs in civil actions on the bond.
“(b) Any person that has furnished labor, materials, or supplies for or in the prosecution of a public work and payment has not been made may institute a civil action upon the payment bond and have their rights and claims adjudicated in a civil action and judgment entered thereon.”
The statute is patterned after the federal “Miller Act,” 40 U.S.C. §§ 3131-3133, see Federal Ins. Co. v. I. Kruger, Inc., 829 So.2d 732, 734 (Ala.2002), and “[t]he construction given to the federal act has been adopted in Alabama, unless otherwise not *753 ed,” Kruger, 829 So.2d at 734 n. 1. In Safeco Insurance Co. of America v. Graybar Electric Co., 59 So.3d 649 (Ala.2010), our supreme court explained the history and purpose of the little Miller Act:
“Generally, when a person has provided labor or materials or has supplied services on a private construction project, the person is entitled under § 35 — 11— 210, Ala.Code 1975, the mechanic’s or materialman’s lien statute, to file a lien against the private property and subsequently to foreclose on the property, if not paid for those services. However, § 35-11-210 does not apply to public property. Martin v. Holtville High School Bldg., 226 Ala. 45, 145 So. 491 (1933) (public-school building was not subject to foreclosure sale under the predecessor statute to § 35-11-210). The Alabama Legislature provided a remedy in 1927 when it codified specific provisions to ensure that materialmen receive full payment for labor or materials supplied on a public-works project. § 39-1-1. Alabama’s statute was patterned after a federal act enacted in 1894 called the Heard Act. Ch. 280, 28 Stat. 278 (1894) (since repealed); see also State v. Southern Sur. Co., 221 Ala. 113, 127 So. 805 (1930) (discussing the essential provisions of the state and federal payment-bond statutes existing in 1930). Alabama first amended its public-works-payment-bond statute in 1935 to pattern it after the federal act called the Miller Act (enacted in 1935 to rectify inadequate protections in the Heard Act). See 40 U.S.C. §§ 3131-3133 (formerly 40 U.S.C. §§ 270a-270d).
‘“[T]he purpose of a payment bond required under the little Miller Act is to “shift the ultimate risk of nonpayment from workmen and suppliers to the surety.” ’ Kruger, 829 So.2d at 736 (quoting American Sur. Co. v. Hinds, 260 F.2d 366, 368 (10th Cir.1958)). ‘The purpose of the [little Miller] act is to provide security for those who furnish labor and material in performance of government contracts as a substitute for unavailable lien rights, and is liberally construed to accomplish this purpose.’ Headley v. Housing Auth. of Prattville, 347 So.2d 532, 535 (Ala.Civ.App.1977).”
59 So.3d at 655-56.
Finish Line argues that the trial court erred in entering summary judgments in favor of Pate and Western because, Finish Line says, it established a right to payment in the amount of $34,123.12 by demonstrating, pursuant to § 39-1-1 (b), that it had “furnished ... materials [valued at $34,123.12] ... for or in the prosecution of a public work and payment has not been made.” Citing Riley-Stabler Construction Co. v. Westinghouse Electric Corp., 396 F.2d 274 (5th Cir.1968), Columbus Rock Co. v. Alabama General Insurance Co., 153 F.Supp. 827 (M.D.Ala.1957), A.G. Gaston Construction Co. v. Hicks, 674 So.2d 545 (Ala.Civ.App.1995), and S T Bunn Construction Co. v. Cataphote, Inc., 621 So.2d 1325 (Ala.Civ.App.1993), Finish Line contends that it sought payment for flooring materials that it supplied for, and that were incorporated into, the construction of the Foley Middle School, but for which it had not been paid.
The two federal cases, as well as this court’s Cataphote decision to which Finish Line directs our attention, dealt with a supplier’s right to payment for materials that were allegedly furnished to a contractor in good faith, but that were diverted by the contractor to other projects, without the knowledge or consent of the supplier. This court’s decision in Hicks dealt with a supplier’s having performed only part of the contract in a satisfactory manner, performance as to which, the trial court held, the supplier was entitled to part payment “[bjecause the contract was based on payment per unit price [and] ... was severa- *754 ble.” 674 So.2d at 547. The decisions upon which Finish Line relies are wholly inapplicable because the defense of setoff was not asserted in any of them, as it was in this case.[3]
Setoff is “ ‘a counter demand which the defendant [has] against the plaintiff arising out of a transaction extrinsic to the plaintiffs cause of action.’ ” Romar Dev. Co. v. Gulf View Mgmt. Corp., 644 So.2d 462, 468 (Ala.1994) (quoting T. Waterman, A Treatise on the Law of Set-Off, Recoupment and Counter Claim § 2 at 3 (2d ed. 1872)). Recoupment, on the other hand,
“authorizes the recovery of any damages sustained by the defendant, which grow out of, or are connected with, the matters set forth in the plaintiff’s complaint, and in breach of the contract upon which his suit is founded, or in violation of any duty imposed by the contract.”
Ewing & Gaines v. Shaw & Co., 83 Ala. 333, 335, 3 So. 692, 693 (1888) (emphasis added). In United Structures of America, Inc. v. G.R.G. Engineering, S.E., 9 F.3d 996 (1st Cir.1993) (“G.R.G.”), then Chief Judge Stephen G. Breyer, writing for the United States Court of Appeals for the First Circuit, explained the distinction more colloquially:
“If Smith sues Jones for $10,000 for grain that Smith supplied, and Jones seeks to reduce the judgment by $5,000 representing Smith’s (unrelated) unpaid rental of Jones’ summer cottage, Jones is seeking a setoff. ‘Recoupment,’ on the other hand, is ‘a reduction or rebate by the defendant of part of the plaintiffs claim because of a right in the defendant arising out of the same transaction.’ [Black’s Law Dictionary ] at 1147 [ (5th ed.1979) ] (emphasis added). If Smith sues Jones for $10,000 for grain that Smith supplied, and Jones seeks to reduce the judgment by $5,000 representing Jones’ expenditure to dry out Smith’s (defectively) wet grain (or the cost of buying replacement grain, or the grain’s lost value), Jones is seeking a recoupment.”
9 F.3d at 998.
In the absence of privity of contract, one may not assert a setoff defense to a Miller Act claim. United States ex rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc., 750 F.2d 759 (9th Cir.1984) (“Avanti”), cert. denied, 474 U.S. 817, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985) (general contractor not entitled to assert setoff against supplier’s claim, absent privity of contract between general contractor and supplier). One federal court has explained that the privity rule for setoff claims is based on the policy of the Miller Act to provide a simple and *755 efficient means by which subcontractors and suppliers can receive payment and that litigation of a totally unrelated matter would be “contrary to the Miller Act’s purpose” because it could potentially “delay and complicate significantly any recovery” by a Miller Act plaintiff. United States ex rel. Acoustical Concepts, Inc. v. Travelers Cas. & Sur. Co. of America, 635 F.Supp.2d 434, 440 (E.D.Va.2009). In our judgment, the setoff defense asserted by Pate and Western in the present case is more correctly characterized as a defensive claim of recoupment or, more precisely, a compulsory counterclaim.[4]
In G.R.G., supra, a supplier provided steel to a subcontractor for two separate construction projects on which G.R.G. Engineering, S.E., was the general contractor: a naval station for the United States government and a police station for the government of Puerto Rico. The first project was governed by the Miller Act and the second project by Puerto Rico’s “little Miller Act.” When the subcontractor failed to pay the supplier in full for the steel it had supplied, the supplier sued G.R.G. and its surety. G.R.G. asserted that it was entitled to a setoff against the amounts claimed by the supplier because, G.R.G. maintained, some of the steel supplied had been defective and G.R.G. had been required to spend additional sums to correct those defects. Relying on Avanti, supra, the district court entered a summary judgment for the supplier. The First Circuit Court of Appeals disagreed and reversed, concluding that the claim asserted as “set-off” in Avanti had actually been a claim of recoupment. The court discussed the distinction between setoff and recoupment and explained the significance of that distinction in Miller Act cases:
“Th[e] distinction [between setoff and recoupment], although somewhat technical, is well established in the law. See, e.g., In re B & L Oil Co., 782 F.2d 155, 157 (10th Cir.1986); 1 David G. Epstein et al., Bankruptcy § 6-45, at 703 (1992) (‘setoff involves mutual debts arising from unrelated transactions and re-coupment covers reciprocal obligations arising out of the same transaction ’) (footnotes omitted); Michael E. Tigar, Comment, 53 Cal. L.Rev. 224, 225 n. 9 (1965) (‘ “Recoupment is contradistin-guished from setoff in these ... essential particulars: 1st. In being confined to matters arising out of, and connected with, the transaction or contract upon which the suit is brought....’” (quoting Waterman, Set-Off, Recoupment and Counterclaim § 480 (2d ed. 1872))). See generally 20 Am.Jur.2d Counterclaim, Recoupment, and Setoff §§ 11, 16-18 (1965).
“This technical legal terminology does not necessarily reflect ordinary usage .... Lawyers, too, might fall into [an imprecise] manner of speaking, for often the technical legal distinction does not matter. See, e.g., B & L Oil, 782 F.2d at 157 (‘Modern rules of pleading have diminished the importance of the common-law distinctions surrounding recoupment and its companion, setoff.’); 20 Am. Jur.2d § 10 (1965) (‘The distinctions between ... recoupment and setoff are no longer of much importance....’). In a few specialized circumstances, however, the difference takes on more significance.
“One such circumstance is bankruptcy....
*756 “The Miller Act seems to us to offer another situation in which one should distinguish setoff from recoupment. The language of the Act permits a supplier to recover, not the full contract price, but the ‘sums justly due him.’ 40 U.S.C. § 270b(a).[5] In our view, the aim of recoupment, ‘do[ing] justice in view of the one transaction as a whole,’ Rothensies [v. Elec. Storage Battery Co.], 329 U.S. [296,] 299, 67 S.Ct. [271], 272 [ (1946) ], would seem to match the statute’s requirement of determining the sums ‘justly due’ a supplier, making re-coupment an appropriate defense in Miller Act cases. Indeed, we do not see how the full contract price of goods supplied can possibly be ‘justly due’ a person who supplied defective goods. Set-off, on the other hand, has less bearing on whether a particular sum is ‘justly due’ the claimant, since setoff functions mostly as a convenient method of dealing with mutual, unrelated debts. Since a true setoff is not before us, however, we need only note the difference and need not go beyond the subject of re-coupment to consider when or whether setoff is unavailable under the Miller Act.
“Further, the policies underlying the Miller Act seem to permit recoupment. The Act is intended ‘to protect those whose labor and materials go into public projects,’ Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co., 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944), but this ‘protection]’ does not include payments to which the supplier’s underlying contract does not entitle him. We know this is true because a Miller Act claim brought by a subcontractor who is in privity with the general contractor ‘is subject to reduction’ for ‘defective articles or work,’ even though the subcontractor’s ‘labor and materials’ were as much a part of the project as were those of an out-of-privity supplier. 8 John C. McBride & Thomas J. Touhey, Government Contracts § 49.490[4], at 49-658 (1993); see, e.g., United States ex rel. Browne & Bryan Lumber Co. v. Massachusetts Bonding & Ins. Co., 303 F.2d 823, 828 (2d Cir.), cert. denied, 371 U.S. 942, 83 S.Ct. 317, 9 L.Ed.2d 276 (1962); United States ex rel. Acme Maintenance Engineering Co. v. Wunderlich Contracting Co., 228 F.2d 66, 68 (10th Cir.1955) (defense of defective workmanship available against subcontractor; failed in this case because general contractor did not meet its burden of proof). We do not understand why the existence or nonexistence of privity of contract should make any difference with regard to these general policies. Nor do we understand how permitting a general contractor to reduce a supplier’s claim by the amount that the general contractor spent remedying the supplier’s failure to comply *757 with his contract somehow ‘unduly burdens’ the supplier’s Miller Act rights. But cf. Avanti, 750 F.2d at 762. On the contrary, disallowing recoupment would seem to give the supplier ‘rights’ to which his contract does not entitle him.
“In short, neither [the supplier] nor the Avanti court itself has pointed to any policy of the Miller Act which would be served by the Avanti rule, nor can we imagine what such a policy would be. We have examined the legislative history of the Miller Act, and the cases and treatises discussing it, but we have found nothing that suggests the conclusion reached in Avanti The materials and policies we have considered, and the language of the statute, point the other way.
“For these reasons, we conclude that the general contractor in this case is entitled to assert a recoupment type of defense. Insofar as GRG shows that [the supplier] delivered defective goods that failed to meet contract specifications, and proves reasonably foreseeable damages caused by those defects, GRG may reduce the award to [the supplier] by the amount of those damages.
“[The supplier] also asserted a claim under Puerto Rico’s Little Miller Act (for the police station project). Our review of that Act has suggested no reason why the result should be different.”
G.R.G., 9 F.3d at 998-1000. See also United States ex rel. Tennessee Valley Marble Holding Co. v. Grunley Constr., 433 F.Supp.2d 104, 116 (D.D.C.2006) (adopting the “rule laid out in G.R.G.: the absence of privity between the general contractor and the supplier does not preclude the general contractor from seeking recoupment for defective materials as a defense to the supplier’s claim under the Miller Act”).
In the present case, both the general contractor (Pate) and the subcontractor (Delta) asserted the absence of privity with Finish Line; each claimed that the other had ordered the flooring materials from Finish Line, and, therefore, was responsible to pay Finish Line for the flooring materials Finish Line had supplied to the construction project. The record does not contain a written contract between Finish Line and either Pate or Delta. We surmise that Pate’s lack-of-privity argument is based on the logic that a flooring-materials supplier (like Finish Line) would not have extended credit to a flooring subcontractor (like Delta), as the evidence in this case indicates that it did, unless the flooring subcontractor had agreed to purchase flooring materials from the supplier. And we further surmise that Delta’s lack-of-privity argument is based on the fact that Pate signed the purchase-order forms as the purchasing agent for the Board in order to avoid sales taxes. See State Dep’t of Revenue v. Kelly Supply Co., 390 So.2d 650 (Ala.Civ.App.1980) (holding that, because general contractor acted as nonprofit association’s agent in purchasing building materials from supplier for use on construction project for the association, supplier did not owe the State or the municipality sales taxes on materials that supplier sold to general contractor for use in the project).
We need not resolve the privity-of-contract issue in this case because we hold (a) that the setoff defense asserted by Pate and Western is actually a counterclaim in the nature of recoupment and (b) that a general contractor may assert, in defense of a little Miller Act claim, recoupment against a supplier even in the absence of privity. Accordingly, we conclude that the trial court could properly enter a summary judgment in favor of Pate and Western on Finish Line’s little Miller Act claims against them.
*758 II.
Our discussion in Part I is based upon the premise that, in entering the summary judgments for Pate and Western on Finish Line’s complaint seeking payment under the little Miller Act, the trial court relied on the setoff defense asserted by Pate and Western in their answers — a defense that we consider a counterclaim in the nature of recoupment. Finish Line contends that the summary judgments in favor of Pate and Western were erroneous because, it says, there was a genuine issue of material fact as to the subject matter of the setoff— i.e., whether the tiles rejected by the architect were themselves defective or whether Delta’s installation of the tiles was improper.
That issue is properly before us despite the fact that Finish Line did not appeal from the partial summary judgment in favor of Delta. First, Finish Line’s factual assertions concerning Delta’s alleged improper installation of the tiles did not state an independent cause of action against Delta. That is so because Delta’s duty with respect to installation of the tiles ran to Pate and the Board, not to Finish Line, so that any alleged breach of that duty could not have provided Finish Line with a separate claim against Delta and could not have been encompassed within the trial court’s partial summary judgment in favor of Delta. Instead, Finish Line’s factual assertions concerning Delta’s alleged improper installation of the tiles merely provided the basis for Finish Line’s answer to Pate and Western’s counterclaim seeking to recoup the amount that Pate had paid for the tiles that had been supplied by Finish Line and rejected by the project architect. See Hanover Ins. Co. v. Alisa Constr. Co., 14 Misc.3d 864, 867, 881 N.Y.S.2d 865, 868 (Sup.Ct.2001).
Second, as we have noted supra, 90 So.3d at 752 n. 2, the trial court necessarily denied Pate’s cross-claims against Delta (which claims were based on Delta’s alleged breach of contract, breach of warranty, and contractual and common-law indemnity) when it entered the summary judgments in favor of Pate and Western and against Finish Line. Rule 4(a)(1), Ala. R.App. P., provides, in pertinent part, that “[o]n an appeal from a judgment or order a party shall be entitled to a review of any judgment, order, or ruling of the trial court.” Accordingly, we address whether Finish Line presented substantial evidence indicating that a genuine issue of material fact existed as to whether the materials it supplied were defective or whether Delta’s installation of the materials was improper.
Delta’s subcontract with Pate specified that “the work to be done by [Delta] ... includ[ed] all labor, materials, equipment ... and other items required” to complete the subcontract. Pursuant to paragraph 9 of the subcontract, Delta warranted “to the Owner, Architect and Contractor that materials and equipment furnished under this Subcontract” would be “of good quality.” Delta agreed that its receipt of payment was dependent upon “certificates of payment issued by the architect.” Paragraph 8 of the subcontract provided:
“Authority of Architect. The Architect will have the authority to reject work which does not conform to the Prime Contract. The Architect’s decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Prime Contract.”
Alabama caselaw has upheld the right of contracting parties to agree that the decision of an expert such as an architect or engineer is final. See Alabama Chem. Co. v. International Agric. Corp., 215 Ala. 381, 110 So. 614 (1926); Catanzano v. Jackson, 198 Ala. 302, 73 So. 510 (1916); Shriner v. Craft, 166 Ala. 146, 51 So. 884 (1910); and Abercrombie & Williams v. Vandiver, 126 *759 Ala. 513, 28 So. 491 (1900). Over a century ago, the Abercrombie court recognized the rule that
“the parties to a contract may stipulate that the estimate of the work done and the compensation due under it, to be made by a third party, shall be final and conclusive, and such stipulation is binding in the absence of fraud or bad faith.”
126 Ala. at 532, 28 So. at 496-97. In Shriner v. Craft, the court held:
“Where a building contract specially provides that the certificate of the architect shall be final and conclusive, it is conclusive and binding in its legal operation and effect on the parties to the contract, and can be impeached only for fraud, or such gross mistakes as would imply bad faith or a failure to exercise an honest judgment.”
166 Ala. at 158, 51 So. at 888. In Alabama Chemical, the court explained the reason for the fraud-or-bad-faith exception to the rule that an expert’s decision designated as “final” in the contract is binding upon the parties:
“Mere mistake or error in the decision of the umpire does not avoid it; if so, the purpose of the stipulation would fail, the right of contract denied, and the chosen means of avoiding controversy made the breeder of litigation. The importance of such provisions in the conduct of many lines of present day business demands that they be annulled only upon substantial and well-established legal grounds.”
215 Ala. at 383, 110 So. at 615. See also Tribble & Stephens Co. v. RGM Constructors, L.P., 154 S.W.3d 639, 653 (Tex.App.2004) (plurality opinion):
“[A]n architect’s decision cannot be set aside by proving that some other architect may have acted or decided an issue differently or ‘simply on a conflict of evidence as to what [ ]he ought to have decided. This must be true, because any other rule would simply leave the matter open for a court or jury to substitute its judgment and discretion for the judgment of the [architect].’ Westech Eng’g, [Inc. v. Clearwater Constructors, Inc.], 835 S.W.2d [190,] 203 [ (Tex.App.-Austin 1992) ] (quoting City of San Antonio v. McKenzie Constr. Co., 136 Tex. 315, 150 S.W.2d 989, 996 (1941)).”
Although Alabama appellate courts have not addressed the specific question whether a challenge to the factual basis for an architect’s decision under circumstances similar to the present case makes summary judgment inappropriate, the North Carolina Court of Appeals decided the issue in Top Line Construction Co. v. J.W. Cook & Sons, Inc., 118 N.C.App. 429, 455 S.E.2d 463 (1995). In that case, a subcontractor who had agreed to provide the labor and materials necessary to complete the masonry work in the construction of a middle school sued the general contractor who had refused to pay the subcontractor’s final bill for the 10% retainage fee withheld pursuant to the subcontract. The general contractor asserted the defense that the subcontractor had failed to perform the masonry work consistent with the requirements of the subcontract. In support of its motion for a summary judgment, the general contractor submitted a letter from the architect, stating that the masonry work was the “worst he had ever seen” in his 40 years as an architect. In opposition to the motion, the subcontractor submitted evidence indicating that the masonry work had been completed according to project specifications and that the general contractor had “approved the work on a weekly basis prior to payment.” 118 N.C.App. at 432, 455 S.E.2d at 465. Consequently, the subcontractor argued, the “credibility [of the architect] is at issue and cannot be resolved on summary judgment.” Id. The trial court entered a sum *760 mary judgment for the general contractor, and the North Carolina appellate court affirmed, stating the following:
“The subcontract designates [the architect] as the judge of acceptable work. ‘[WJhere the contract provides that the work shall be done to the satisfaction, approval, or acceptance of an architect or engineer, ... the parties are bound by his decision, in the absence of fraud or gross mistake.’ Welborn Plumbing and Heating Co. v. Randolph County Board of Education, 268 N.C. 85, 90,150 S.E.2d 65, 68 (1966) (quoting 13 Am. Jur.2d Building, Etc. Contracts, § 34 (1964)). There is no evidence here of fraud or gross mistake. [The subcontractor] expressly agreed to be bound by this clause and [the general contractor] retained its right to recover damages for malperformance of the contract. Accordingly, there are no genuine issues of material fact. [The architect’s] judgment as to the quality of the masonry work is final as between the parties and [the general contractor] is entitled to recover from [the subcontractor] the amount it was backcharged by the school board. Summary judgment was properly entered against [the subcontractor].”
118 N.C-App. at 432-33, 455 S.E.2d at 465.
The North Carolina Court of Appeals has also held that, “[w]hen an architect is vested with the authority to render judgment on a contractor’s performance, the determination is prima facie correct, and the other parties have the burden of proving fraud or mistake.” Biemann & Rowell Co. v. Donohoe Cos., 147 N.C.App. 239, 243, 556 S.E.2d 1, 4 (2001) (citing Bolton Corp. v. T.A. Loving Co., 94 N.C.App. 392, 402, 380 S.E.2d 796, 803 (1989), quoting in turn Barnes Constr. Co. v. Washington Twp., 134 Ind.App. 461, 466, 184 N.E.2d 763, 764-65 (1962)). Because Finish Line neither alleged nor submitted evidence indicating that the architect’s decision was the product of fraud, bad faith, or gross mistake “as would imply bad faith or a failure to exercise an honest judgment,” Shriner v. Craft, 166 Ala. at 158, 51 So. at 888, the trial court was not presented with substantial evidence creating a genuine issue of material fact. Compare Richards & Assocs., Inc. v. Fidelity Sound, Inc., 137 Ga.App. 752, 753, 224 S.E.2d 832, 833 (1976) (“The defendant contends the architect had acted in bad faith or as a result of a gross mistake. If this be shown by the evidence, a jury issue would be made as to whether the architect had acted in bad faith, arbitrarily or capriciously, so as to amount to an abuse of his discretion.”).
For two reasons, we conclude that, for purposes of the recoupment claim asserted by Pate and Western, Finish Line is bound by the language in the subcontract between Pate and Delta that accords finality to the architect’s decision — notwithstanding the fact that Finish Line was not a party to the subcontract. First, the little Miller Act “does not require that the materialman be in privity of contract with the primary contracting parties,” SGB Constr. Servs., Inc. v. Ray Sumlin Constr. Co., 644 So.2d 892, 895 (Ala.1994) (citing Sumlin v. Hagan Storm Fence Co. of Mobile, 409 So.2d 818 (Ala.1982)). Second, “[t]he essence of [the] policy [of the Miller Act] is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material.” United States ex rel. Sherman v. Carter, 353 U.S. 210, 216-17, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957) (emphasis added). It is undisputed that, before the architect rejected the Seneca tiles supplied by Finish Line, Pate had already paid Finish Line $39,075 for those tiles, and after the architect rejected the Seneca tiles, Pate obtained and paid for replacement tiles. If Pate can rely upon the finality of the architect’s decision, then it is *761 not a “defaulting contractor” because it is entitled to deduct from the purchase price of other flooring materials supplied by Finish Line the amount it spent to cure the defects in the Seneca tiles supplied by Finish Line. See G.R.G, 9 F.3d at 1000 (stating that, “[ijnsofar as [the general contractor] shows that [the supplier] delivered defective goods that failed to meet contract specifications, and proves ... damages caused by those defects, [the general contractor] may reduce the award to [the supplier] by the amount of those damages”).
The judgment of the Baldwin Circuit Court is affirmed.
AFFIRMED.
THOMPSON, P.J., and THOMAS, J., concur.
BRYAN, J., concurs in part and concurs in the result, with writing.
MOORE, J., concurs in the result, without writing.

. Although Finish Line had not alleged in its complaint that Delta’s faulty installation of the Seneca tiles was the reason for the architect’s rejection of those tiles, Delta’s answer asserted that Delta had assumed that Finish Line was claiming that Delta "is liable for the Board’s nonpayment of Finish Line....”

. Notwithstanding the fact that the trial court did not expressly rule on Pate's cross-claims against Delta, and did not certify the summary judgments in favor of the remaining defendants as final, the judgments appealed from are final. Pate’s cross-claims against Delta, being contingent upon the liability of Pate to Finish Line, were necessarily denied when the trial court entered a summary judgment in favor of Pate and against Finish Line. See Franklin v. Mitchell, 87 So.3d 573, 577 n. 2 (Ala.Civ.App.2011).

. Although Pate and Western asserted the affirmative defense of setoff in their answers, the summary-judgment motions they filed did not argue setoff as a basis for granting the motions. At oral argument before this court on January 11, 2012, however, counsel for Pate and Western stated that the setoff issue was the focus of the argument before the trial court at the hearing on Pate’s and Western's summary-judgment motions. Counsel who appeared for Finish Line at oral argument before this court stated that he had not been present when the summary-judgment motions were argued in the trial court.
In their appellate briefs, all the parties acknowledge that the trial court had no basis except setoff upon which to enter a summary judgment in favor of Pate and Western. Finish Line says that, “for the trial judge to arrive at the decision that he did, ... the judge had to accept Pate’s position that this offset should be allowed.” Pate and Western say that ”[t]he unopposed facts before the trial court support the finding [that] Pate, [and] Western ... were due setoff as a consequence of the breach of contract by Finish Line and Finish Line’s failure to provide materials conforming to the project specifications.”

. “Among the changes effected in 1973 by the Rules [of Civil Procedure] was the ‘modernization of terminology.’ Ala. R. Civ. P. 81(e). Specifically, Rule 81(e) converts the terms 'recoupment' to 'compulsory counterclaim,' and 'set-off to ‘permissive counterclaim.’ ” Romar Dev. Co. v. Gulf View Mgmt. Corp., 644 So.2d at 470.

. The Miller Act was amended in 2002. The current version, found at 40 U.S.C. §§ 3131— 3133, does not contain the phrase "justly due.”
"Although the current version of the Miller Act does not use the phrase 'justly due’ as did its predecessor, the 2002 amendments were not meant to substantively change the statute. H.R.Rep. No. 107-479, at 2 (2002), reprinted in 2002 U.S.C.C.A.N. 827, 827-28. The changes in language merely resulted from consolidating related provisions of law, the pursuit to achieve uniformity within the title, or to conform to common contemporary usage. Id. Therefore, the First Circuit's reliance [in G.R.G.] on the phrase 'justly due' in reaching its conclusion need not affect the Court’s reasoning; the Court's interpretation of the Miller Act’s underlying policies still serves as valuable persuasive authority because the 2002 amendments to the Miller Act did not change the substance of the statute.”
United States ex rel. Tennessee Valley Marble Holding Co. v. Grunley Constr., 433 F.Supp.2d 104, 116 n. 3 (D.D.C.2006).